PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x 101
Fax: (888) 975-1957
mbendat@psych-appeal.com

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (*pro hac vice* forthcoming)
Jason S. Cowart (*pro hac vice* forthcoming)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

ZUCKERMAN SPAEDER LLP
Caroline E. Reynolds (*pro hac vice* forthcoming)
1800 M St., NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
creynolds@zuckerman.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| TAMAR LOWELL and THOMAS LOWELL, on their own behalf and on behalf of their beneficiary son, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED BEHAVIORAL HEALTH and UNITEDHEALTHCARE INSURANCE COMPANY, <br><br> Defendants. | Case No. 3:20-cv-01989 <br><br><br> **COMPLAINT** |

Plaintiffs Tamar and Thomas Lowell ("Plaintiffs") complain as follows on behalf of themselves and their beneficiary son, based on the best of their knowledge, information and belief, formed after an inquiry reasonable under the circumstances by themselves and their undersigned counsel, against Defendants United Behavioral Health ("UBH") and UnitedHealthcare Insurance Company ("UHIC"):

**INTRODUCTION**

1.      This case arises from Defendant UBH's wrongful decision to deny coverage for mental health services at a residential treatment center ("RTC") for Plaintiffs' 11-year-old son, "A.L."

2.      A.L. suffers from severe mental health conditions, including Reactive Attachment Disorder and Selective Mutism. His disorders are chronic and require frequent and sustained behavioral interventions. Over several years, Plaintiffs tried every available treatment option for A.L. within geographic proximity of their home on Bainbridge Island, located off the Seattle coast. Every one of these treatment options failed to treat A.L.'s mental health conditions effectively. A.L. continued to exhibit persistent violent behaviors at home, including setting fires and hitting his sister with a baseball bat. On the recommendation of treatment providers, Plaintiffs made the difficult decision to admit A.L. to an RTC several hours away from their home.

3.      Despite A.L.'s chronic and pervasive conditions, Defendant UBH covered less than two weeks of care at an RTC before denying further coverage, stating that "care could [have] continue[d] in the Mental Health Partial Hospital Program [PHP] setting." Unlike RTC, which provides 24-hour therapeutic structure, intensive clinical services, and on-premises schooling, PHP only provides clinical services 5 to 8 hours a day, 5 days a week and imposes significant scheduling and transportation challenges for both children and caretakers. The clinical components of PHP are thus subsumed by RTC.

4.      PHP services for children A.L.'s age are extremely rare. In fact, as UBH knows, there are no PHP services for children of A.L.'s age who struggle with his particular conditions on Bainbridge Island or anywhere near Seattle.

5. Plaintiffs' fully-insured, employer-sponsored health plan, issued by UnitedHealthcare Insurance Company, requires UBH to make medical necessity determinations in a manner consistent with generally accepted standards of medical practice.

6. In *Wit et al. v. United Behavioral Health*, Case No. 14-cv-02346 (N.D. Cal.), this court articulated the generally accepted standards of medical practice by which UBH is bound to adjudicate mental health claims and found that, among them, is an obligation to err on the side of caution and to place patients at higher levels of care when lower levels of care are unavailable or when there is uncertainty about the most appropriate level of care.

7. Yet, rather than cover RTC, which provides boarding and can therefore actually accommodate and treat A.L., UBH self-servingly recommended PHP, a geographically unavailable level of care for A.L. that would have required his parents to drive up to four hours a day to reach. As an alternative, UBH failed to offer to offset the cost of RTC services with an amount equal to what PHP would have cost. Instead, UBH simply denied coverage altogether.

8. In denying RTC coverage, UBH relied on its 2018 "Level of Care Guidelines" to determine whether RTC services were consistent with generally accepted standards of medical practice.

9. As detailed below, UBH's 2018 Level of Care Guidelines are identical in all material respects to the UBH Guidelines from 2011 through 2017 that have been challenged in two certified class actions pending in this Court: *Wit et al. v. United Behavioral Health*, Case No. 14-cv-02346 (N.D. Cal.) and *Alexander et al. v. United Behavioral Health*, Case No. 14-cv-05337 (N.D. Cal.). The cases have been consolidated and will be referred to collectively herein as the "*Wit* Litigation." The plaintiffs in the *Wit* Litigation asserted claims against UBH under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

10. Following a trial on the merits of the *Wit* Litigation, Chief Magistrate Judge Joseph C. Spero found that the UBH Level of Care Guidelines in effect from 2011 through 2017 were unreasonable and did not reflect generally accepted standards of care, and thus conflicted with the relevant terms of the *Wit* class members' plans. Accordingly, Judge Spero concluded that UBH

breached its ERISA fiduciary duties by adopting its pervasively-flawed Guidelines and that UBH abused its discretion when it used the Guidelines to deny coverage to the *Wit* class members.

11.    UBH has already been found liable for breaching its fiduciary duties and violating ERISA by creating pervasively-flawed Level of Care Guidelines for 2011 through 2017 and using them to deny coverage to thousands of its members. For the same reasons, UBH again breached its fiduciary duties and violated ERISA by creating Level of Care Guidelines for 2018 that were substantively unchanged from the prior versions, and using them to deny Plaintiffs' request for coverage for A.L.'s residential treatment.  Remarkably, even after the nearly identical criteria were found unlawful in the *Wit* Litigation, UBH continued to uphold its denial of coverage to A.L. based on its 2018 Level of Care Guidelines.

## THE PARTIES

12.    Plaintiffs Tamar and Thomas Lowell are participants in the Access Trips Inc. Plan, an employee welfare benefit plan sponsored by their employer (the "Lowell Plan" or the "Plan"). Plaintiffs' son A.L. is a beneficiary of the Lowell Plan. Plaintiffs reside in Bainbridge Island, Washington.

13.    Defendant UnitedHealthcare Insurance Company ("UHIC"), a subsidiary of UnitedHealth Group ("UHG" and, together with Defendants, "United") is the underwriter of and claims administrator for the Lowell Plan and is based in Hartford, Connecticut. UHIC issued the Certificate of Coverage for the Lowell Plan and is vested with the fiduciary responsibility to make all final and binding coverage determinations under the Plan.

14.    Defendant UHIC delegated responsibility for making all final and binding coverage determinations for mental health and substance use disorder benefits under the Lowell Plan to its corporate affiliate, Defendant United Behavioral Health ("UBH"), which also bears the financial risk for mental health claims.

15.    Defendant United Behavioral Health ("UBH"), which operates under the brand name, "Optum," is a corporation organized under California law, with its principal place of business in San Francisco, California.

16.     Because of the role that UHIC plays in delegating its responsibility for final and binding coverage determinations and the role that UBH plays in making final and binding coverage determinations under the Lowell Plan, both Defendants are functional fiduciaries under ERISA, 29 U.S.C. § 1104.  As ERISA fiduciaries, UHIC and UBH owe duties of loyalty to plan participants and beneficiaries, which require them to act "solely in the interests of the participants and beneficiaries" of the plans they administer and for the "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plans. 29 U.S.C. § 1104(a)(1)(A). UHIC and UBH also owe plan participants and beneficiaries duties of care, which require Defendants to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans, so long as such terms are consistent with ERISA. *Id.* § 1104(a)(1)(B), (D).

## JURISDICTION AND VENUE

17.     Defendant UBH's actions in administering employer-sponsored health care plans, including exercising discretion with respect to determinations of coverage for Plaintiffs' son A.L. under the Lowell Plan, are governed by ERISA, 29 U.S.C. §§ 1001–1461. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

18.     Personal jurisdiction over Defendant UBH exists with this Court. UBH is a corporation organized under California law with significant contacts in California.

19.     Venue is appropriate in this District. Defendant UBH is headquartered in this District, administers plans here, and conducts significant operations here.

## INTRADISTRICT ASSIGNMENT

20.     This case should be assigned to the San Francisco Division of this Court because Defendant UBH is headquartered in San Francisco, administers plans here, and conducts significant operations here.

COMPLAINT
CASE NO. 3:20-CV-01989

## STATEMENT OF FACTS

**I.   Plaintiffs' Plan**

21.    The Lowell Plan is a fully-insured plan issued by UHIC and governed by ERISA and Washington State law.

22.    The Lowell Plan covers treatment for sickness, injury, mental illness, and substance use disorders. Residential treatment is a covered benefit under the Plan. The Plan does not limit coverage for residential treatment to emergency, short-term or crisis stabilization services.

23.    The Lowell Plan explains that health care services from out-of-network providers may be paid as network benefits when covered services are not available from network providers. Under such circumstances, Plan members are not subjected to any greater costs than if the services were provided from network providers. This requirement is consistent with WAC 284-170-200(5).

24.    As the behavioral health administrator for the Lowell Plan, UBH exercises its discretion to interpret Plan terms, limitations, and exclusions, to make determinations of coverage for behavioral health services, and to cause any resulting benefit payments to be made by the Plan. Under the terms of the Lowell Plan, an essential condition of coverage is that covered services must be consistent with generally accepted standards of medical practice.

25.    Therefore, one of the essential determinations UBH must make when reviewing claims for coverage under the Plan is whether the services for which coverage is requested are consistent with generally accepted standards of medical practice. As described below, one of the generally accepted standards of practice that UBH must follow when adjudicating benefits is to err on the side of caution by approving coverage at higher levels of care when there is ambiguity about the appropriate level of care or when the appropriate level of care is not available. UBH developed its Level of Care Guidelines to make determinations regarding whether services for which coverage is requested are consistent with generally accepted standards of medical practice.

## II.     Generally Accepted Standards of Medical Practice

26.     Generally accepted standards of medical practice, in the context of mental health disorder services, are the standards that have achieved widespread acceptance among behavioral health professionals.

27.     In the area of mental health disorder treatment, there is a continuum of intensity at which services are delivered. There are generally accepted standards of medical practice for matching patients with the level of care that is most appropriate and effective for treating patients' conditions.

28.     These generally accepted standards of medical practice are reflected in multiple sources, including peer-reviewed studies in academic journals, consensus guidelines from professional organizations, and guidelines and materials distributed by government agencies, including: (a) the American Association of Community Psychiatrists' ("AACP") Level of Care Utilization System; (b) the Child and Adolescent Level of Care Utilization System ("CALOCUS") developed by AACP and the American Academy of Child and Adolescent Psychiatry ("AACAP"); and the Child and Adolescent Service Intensity Instrument ("CASII") which was developed by AACAP in 2001 as a refinement of CALOCUS; (c) the Medicare benefit policy manual issued by the Centers for Medicare and Medicaid Services ("CMS"); and (d) AACAP's Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers.

29.     The generally accepted standards of medical practice for matching patients with the most appropriate and effective level of care for treating patients' mental health conditions include the following:

a.   **First**, many mental health disorders are long-term and chronic. While current symptoms are typically related to a patient's chronic condition, it is generally accepted in the behavioral health community that effective treatment of individuals with mental health disorders is not limited to the alleviation of the current symptoms. Rather, effective treatment requires treatment of the chronic underlying condition as well.

b. **Second**, many individuals with behavioral health diagnoses have multiple, co-occurring disorders. Because co-occurring disorders can aggravate each other, treating any of them effectively requires a comprehensive, coordinated approach to all conditions. Similarly, the presence of a co-occurring medical condition is an aggravating factor that may necessitate a more intensive level of care for the patient to be effectively treated.

c. **Third**, in order to treat patients with mental health disorders effectively, it is important to "match" them to the appropriate level of care. The driving factors in determining the appropriate treatment level should be safety and effectiveness; however, where more than one service level will equally meet both of these requirements, the least intensive and/or restrictive setting should be selected.

d. **Fourth**, when there is ambiguity as to the appropriate level of care, generally accepted standards call for erring on the side of caution by placing the patient in a higher level of care. Research has demonstrated that patients with mental health disorders who receive treatment at a lower level of care than is clinically appropriate face worse outcomes than those who are treated at the appropriate level of care. On the other hand, there is no research that establishes that placement at a higher level of care than is appropriate results in an increase in adverse outcomes.

e. **Fifth**, while effective treatment may result in improvement in the patient's level of functioning, it is well-established that effective treatment also includes treatment aimed at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning.

f. **Sixth**, the appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment.

g. **Seventh**, one of the primary differences between adults, on the one hand, and children and adolescents, on the other, is that children and adolescents are not fully "developed," in the psychiatric sense. The unique needs of children and adolescents

must be taken into account when making level of care decisions involving their treatment for mental health disorders. One of the ways practitioners take into account the developmental level of a child or adolescent in making treatment decisions is by relaxing the threshold requirements for admission and continued service at a given level of care.

h. **Eighth**, the determination of the appropriate level of care for patients with mental health disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient. Except in acute situations that require hospitalization, where safety alone may necessitate the highest level of care, decisions about the level of care at which a patient should receive treatment should be made based upon a holistic, biopsychosocial assessment that involves consideration of multiple dimensions.

30.     UBH, as claims administrator and ERISA fiduciary, owed the participants and beneficiaries of the Lowell Plan a fiduciary duty to take reasonable steps to interpret the Plan, including when establishing the criteria by which it would determine whether services are consistent with generally accepted standards of medical practice. It was UBH's duty to use due care and act prudently and solely in the interests of the Plan participants and beneficiaries when doing so.

31.     When interpreting its plans, UBH had access to the independent, publicly available sources, described above, that elucidate the generally accepted standards of care. Thus, UBH knew, or should have known, what the generally accepted standards of medical practice are.

## III.    The 2018 Level of Care Guidelines

32.     UBH exercised its discretion under the plans it administers by, among other things, developing, adopting, and applying its own clinical criteria for determining whether services for which coverage is requested are consistent with generally accepted standards of medical practice. The clinical criteria UBH adopted and applied are called the UBH Level of Care Guidelines ("LOCGs").

-8-

33.     The Level of Care Guidelines are organized by the situs of care, or "level of care," according to progressive levels of service intensity along the continuum of care (i.e., outpatient, intensive outpatient, partial hospitalization, residential, and hospital).

34.     The 2018 Level of Care Guidelines at issue in this case contained a set of mandatory "Common Criteria," all of which had to be satisfied for coverage to be approved at any level of care. In addition, the Guidelines contained specific criteria applicable to particular levels of care in the context of mental health conditions, which also had to be satisfied in order for coverage to be approved at a particular level of care.

35.     As noted above, Judge Spero found, after a trial on the merits in the *Wit* Litigation, that the Level of Care Guidelines in effect from 2011 to 2017 were pervasively more restrictive than the generally accepted standards of medical practice described above, and thus conflicted with the terms of the ERISA plans at issue, which—like the Lowell Plan—required services to be consistent with generally accepted standards.

36.     In a detailed opinion, Judge Spero held that the UBH Level of Care Guidelines in effect from 2011 to 2017 were pervasively more restrictive than generally accepted standards of medical practice because they restricted coverage to the treatment of acute behavioral health conditions and symptoms, in contrast to generally accepted standards of medical practice that include concurrent effective treatment to address chronic or co-occurring conditions or symptoms.

37.     As Judge Spero held, UBH's Level of Care Guidelines were "riddled with requirements that provided for narrower coverage than is consistent with generally accepted standards of care." Judge Spero further found that UBH's decisions to implement these defective standards were improperly motivated by UBH's financial self-interest. In light of these defects in UBH's Level of Care Guidelines, Judge Spero found that using them to determine whether services were consistent with generally accepted standards of medical practice was "unreasonable and an abuse of discretion because they were more restrictive than generally accepted standards of care."

38.     Judge Spero's decision in the *Wit* Litigation applies directly to the 2018 Level of Care Guidelines that UBH used to deny coverage to Plaintiffs' son, A.L., because the 2018 Level of Care Guidelines were substantively unchanged from the prior versions.

39.     Even though UBH knew, or should have known, that its 2018 Level of Care Guidelines were much more restrictive than generally accepted standards of care, and that UBH developed them to advance its own financial self-interest as well as that of its other corporate affiliates and employer-plan sponsors, UBH continued to apply its overly-restrictive 2018 Level of Care Guidelines, which became effective on May 9, 2018.

40.     By continuing to use its own overly-restrictive Guidelines, UBH (a) avoided or reduced the benefit expense it would otherwise pay from its own assets if approving coverage under fully-insured plans; (b) saved its plan-sponsor employers money (albeit in contravention of plan terms), making it more likely that plan sponsors would employ UBH as claims administrator, thus prioritizing UBH's own financial interest; (c) avoided incurring licensing and other costs it would have incurred if it used third-party guidelines; (d) deflected the issues that would have arisen if it used different guidelines than its sister companies (*i.e.*, other subsidiaries of UBH's parent, UnitedHealth Group) to interpret the same relevant plan terms relating to generally accepted standards of medical practice; and (e) saved money for itself and its corporate affiliates vis-à-vis the stop-loss policies sold to its plan-sponsor employer customers.

**IV.     Plaintiffs Were Forced to Place Their Son, A.L., at an RTC and Sought Coverage from UBH Pursuant to Their Plan**

41.     Plaintiffs' son, A.L., is 11 years old. Plaintiffs adopted A.L. from a Russian orphanage when he was 16 months old. A.L. suffers from severe, comorbid mental health disorders, including Reactive Attachment Disorder, Selective Mutism, Generalized Anxiety Disorder, and ADHD. A.L. also suffers from prenatal alcohol exposure.

42.     Plaintiffs spent years attempting various treatment options for A.L. For example, between 2014 and 2018, A.L. attended weekly therapy sessions with Linnea Lauer, LMHC. Ms. Lauer has been practicing as a child therapist for close to 30 years, and she specializes in adopted children who have been exposed to trauma. In a Letter of Medical Necessity related to A.L.'s need for treatment in an RTC setting, Ms. Lauer wrote that A.L.'s "behaviors are among the most severe I have seen in my almost 30 years as a child therapist." Ms. Lauer eventually terminated treatment of A.L. in June 2018 because she "could not meet his needs," which she reported was "the only

time in my career that I have had to make the decision to terminate treatment." Ms. Lauer wrote that, "at the time we ended treatment, [A.L.'s behaviors] were getting worse, not better." Ms. Lauer concluded that "[g]iven that [A.L.]'s behaviors were regular, persistent, and increasingly dangerous despite years of therapy and medication, it is my strong belief that there is no outpatient program that can address [A.L.]'s complex issues and that he requires intensive residential treatment."

43.     By mid-2018, A.L.'s behaviors had turned increasingly violent, especially at home. A.L. continued starting fires in Plaintiffs' home and caused Plaintiffs' other child, M.L., to develop Post-Traumatic Stress Disorder ("PTSD"). A.L. also drew a picture of M.L.'s throat being slit with a knife with a caption threatening her death.

44.     Pursuant to their Plan, on June 15, 2018, Thomas Lowell contacted UBH to inquire about residential treatment centers available for their son. In turn, UBH "Care Advocate"[1] Cynthia Robelotto, falsely advised Mr. Lowell that "long term residential [c]are [is] not cov[ere]d by the [b]ehavioral h[ealth] plan" and that she "was able to locate only one RTC in 500 m[ile] radius"— Trillium Family Services. Not only was Trillium Family Services a short-term residential treatment center unsuitable for children with long-term treatment needs, but it was also located hundreds of miles away from Plaintiffs' home. Ms. Robelotto encouraged Plaintiffs to "ask o[ut]p[atient] pr[o]v[ider]s if they have any other RTC recommendations and explained that a SCA [single case agreement] might be available for an oon [out-of-network] fac[ility] if loc [level of care] is approved."

45.     On August 16, 2018, Plaintiffs admitted A.L. to Intermountain, a licensed, non-profit residential treatment center in Helena, Montana that is accredited by the Council on Accreditation and is out-of-network with UBH. Intermountain is one of a handful of RTCs in the United States that specialize in childhood attachment trauma.

46.     Pursuant to their Plan, Plaintiffs sought coverage from UBH for RTC services for A.L. beginning on August 16, 2018. Although UBH authorized coverage for treatment in an RTC from August 16, 2018, the date of A.L.'s admission, through August 28, 2018—a period of less

---

[1] UBH styles its in-house claims adjusters as "Care Advocates" to foster an illusion of "advocacy" for beneficiaries, rather than UBH.

than two weeks—UBH failed to reimburse Plaintiffs at the in-network benefit level despite UBH's admitted network inadequacy. In doing so, UBH violated Plaintiffs' Plan and WAC 284-170-200(5).

**V.     UBH Has Continually Denied Coverage for RTC and Instead Recommended A Level of Care (PHP) Pursuant to its Overly Restrictive 2018 Level of Care Guidelines, Repeatedly Suggesting Other Treatment "Options" that UBH Knows Are Not Available in Plaintiffs' Community.**

47.     On August 31, 2018, despite being informed by Intermountain that A.L.'s care "would be a 'slow process' due to his lack of engagement," UBH denied further coverage for A.L.'s treatment in an RTC setting from August 29, 2018 forward. UBH notified Plaintiffs of this decision by letter dated September 5, 2018. The letter explained that UBH's denial was based on the 2018 "Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care." UBH's denial determination was thus based on its 2018 Level of Care Guidelines.[2]

48.     Contrary to the clinical evidence within UBH's possession, the letter explained that "your child has made progress and that your child's condition no longer meets Guidelines for further coverage of treatment in [a residential] setting. . . . Your child has a support system that can facilitate his recovery." The letter concluded: "Recovery can continue at a lower level of care. Your child could continue care in the mental health partial hospitalization program setting." UBH's internal case notes further reflect that "there have been no over [sic] behavioral issues and no *imminent* threats or acts of physical aggression or assaultive behaviors. There is no documentation of ongoing *imminent* risk to self or others" (emphasis added). This commentary is particularly troubling given that even UBH's defective 2018 Level of Care Guidelines expressly disclaimed imminent risk to self or others as a basis for residential treatment and instead required psychiatric *hospitalization* – a higher level of service intensity – when such factors are present.

---

[2] UBH has since abandoned its proprietary mental health guidelines in favor of ones developed by non-profit clinical specialty associations. *See* https://www.providerexpress.com/content/ope-provexpr/us/en/clinical-resources/guidelines-policies/Adoption-of-LOCUS-CASII-ECSII.html.

49.     At the recommendation of A.L.'s treatment providers, and because PHP is not available in their community, Plaintiffs did not discharge their son from Intermountain, where he currently remains at the unreimbursed cost of $15,000 per month.

50.     Although residential treatment subsumes the clinical components of PHP, UBH did not offer to reimburse A.L. at the rate applicable to the lesser-included level of care. Instead, UBH denied coverage in full, despite its own recommendation for ongoing treatment at the PHP level of care.

51.     On February 18, 2019, Plaintiffs appealed UBH's coverage denial for RTC dates of service August 29, 2018 through January 31, 2019. Among many other supporting medical documents, Plaintiffs enclosed with their appeal a letter of medical necessity from Patricia Varley, ARNP, a psychiatric nurse practitioner at Seattle Children's Hospital who had treated A.L. in an outpatient setting over a period of 18 months between January 2017 and June 2018. Ms. Varley explained that over that entire 18-month period of outpatient treatment, "we were never able to eliminate the violent and destructive meltdowns that [A.L.] had predominantly at home." Plaintiffs' appeal letter explained the absurdity of UBH's conclusion that, notwithstanding this history, A.L.'s need for RTC services could have evaporated in a period of less than two weeks.

52.     On February 28, 2019, during the time that Plaintiffs' appeal of coverage denials through January 31, 2019 was pending, Judge Spero issued his decision on the merits in *Wit et al. v. United Behavioral Health*, No. 14-CV-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019). Judge Spero found that treatment in an RTC setting "is for individuals who do not pose an imminent risk of serious harm to self or others (*i.e.*, who do not need inpatient hospitalization), but rather, 'because of specific functional limitations, need safe and stable living environments and 24-hour care.'" Judge Spero further explained that RTC "is not limited to addressing acute symptoms to achieve crisis stabilization; instead, it is designed to provide patients with an 'opportunity to engage underlying chronic, recurrent, comorbid issues.'" Judge Spero held that UBH's Level of Care Guidelines from 2011 through 2017 fell short of generally accepted standards of care because they placed "an excessive emphasis on addressing acute symptoms and stabilizing crises while ignoring the effective treatment of members' underlying conditions[,] . . . result[ing] in a significantly

narrower scope of coverage than is consistent with generally accepted standards of care." Judge Spero concluded that "the process UBH uses to develop its Guidelines" is "fundamentally flawed because it is tainted by UBH's financial interests."

53.     Particularly relevant to Plaintiffs' claims was Judge Spero's finding that when there is ambiguity as to the appropriate level of care or an appropriate level of care is unavailable, generally accepted standards of medical practice require erring on the side of caution by placing patients in higher levels of care: "In general, when the criteria designate a treatment placement that is not available, a strategy must be crafted that gives the patient the needed services in another placement or combination of placements. The paramount objective should be safety and effectiveness, which usually requires opting for a program of greater intensity than the placement criteria indicate . . . if the most effective level of care is not available or there's a gray area between two levels of care, one should take the conservative position and round up, as it were, or go to the next highest level of care."

54.     Notwithstanding Judge Spero's findings that UBH's Level of Care Guidelines from 2011 through 2017 were pervasively flawed and more restrictive than generally accepted standards of medical practice, that they unduly focused on stabilization of acute symptoms rather than treatment of underlying chronic, recurring issues, that they failed to err on the side of caution by improperly relegating patients to lower levels of care that may not be as effective (or, as in Plaintiffs' case, may not even exist), and that the process of developing those Guidelines was tainted by UBH's financial interests, UBH refused to revisit its denial of coverage for RTC services for A.L. that was based on its materially-identical 2018 Level of Care Guidelines.

55.     UBH issued a "final adverse determination" of Plaintiffs' appeal by letter dated April 29, 2019. The denial letter stated: "The request cannot be approved at this time by your health plan. Instead, your child could have continued care in the Mental Health Partial Hospital Program setting, with family and community supports. PHP provides continued structure with frequent provider. [sic] Partial Hospital Program lets patients practice coping skills outside of program hours. Children and adolescents usually live at home during PHP."

56.     As reflected in UBH's internal records, Plaintiff Thomas Lowell called UBH multiple times after receiving the appeal denial letter to inquire about Plaintiffs' options. On June 28, 2019, Kristin Starbuck, a UBH "Care Advocate," spoke with Mr. Lowell and wrote: "Father is seeking options for [mental health] PHP. Mbr is currently admitted into RTC with [a diagnosis] of [Reactive Attachment Disorder]. A denial has been issued for continued [treatment] with a recommendation of [PHP]. ***There are no [in-network] [PHP] facilities within geo and [care advocate] could not locate any [out-of-network] [PHP] facilities for children online.*** Closest [in-network] facility would take father an hour and forty five minutes one way. . . . Care Advocate suggested father speak with mbr's psychiatrist/therapist and RTC for possible recommendations. Care Advocate also referred m[em]b[e]r case to Behavioral Health Case M[ana]g[e]mt for follow up."

57.     Thus, rather than reprocessing UBH's past denials of residential treatment or authorizing ongoing coverage due to the complete unavailability of PHP for A.L., UBH's "Care Advocate" simply ignored UBH's contractual responsibilities to cover services (1) in a manner consistent with generally accepted standards of medical practice and (2) at the in-network benefit level owing to the utter lack of both in-network RTC and PHP within geographic access. Unsurprisingly, Plaintiffs never heard from either the "Care Advocate" or UBH's Behavioral Health Case Management team with any solutions.

58.     On November 22, 2019, Plaintiffs submitted an appeal to UBH challenging its denial of coverage for RTC services for A.L. between February 1, 2019 and July 31, 2019.

59.     On December 31, 2019, UBH denied Plaintiffs' appeal. Contrary to the terms of Plaintiffs' Plan, which places the obligation to submit and perfect out-of-network claims squarely on members, UBH's letter indicated that it was the service provider's (and not Plaintiffs') "responsibility" to appeal denials of coverage. UBH's letter stated Plaintiffs should not appeal "unless you sign a written explicit payment arrangement following the receipt of this non-coverage determination where you agree to pay for additional services." Rather than adjudicate Plaintiffs' appeal as a matter of ***right***, UBH did not render any substantive decision on Plaintiffs' appeal of

1   November 22, 2019, as UBH was required to do under the terms of Plaintiffs' Plan, as well as

2   applicable ERISA regulations, within 30 days.

3       60.     On January 17, 2020, Plaintiffs sent a fax to UBH explaining that they have a right

4   to appeal any adverse benefit determination under their Plan, irrespective of any member financial

5   responsibility. Plaintiffs also explained that "UBH is legally precluded from requiring proof of out-

6   of-pocket loss before it processes appeals." Nonetheless, Plaintiffs noted that "we have in fact

7   incurred significant out-of-pocket losses" with respect to the claims at issue.

8       61.     UBH never responded to Plaintiffs' January 17, 2020 correspondence. Under the

9   terms of their Plan and ERISA, Plaintiffs are deemed to have exhausted UBH's internal appeals

10  procedure with respect to denials of residential treatment coverage for services from August 29,

11  2018 and forward.

12

13  **VI.    UBH Violated ERISA and the Plan's Terms**

14      62.     In light of its central role in administering claims for coverage of mental health and

15  substance abuse disorder treatment, UBH is an ERISA fiduciary as defined by 29 U.S.C. § 1104(a).

16  As such, UBH owes a duty of loyalty to Plan participants and beneficiaries which requires it to

17  discharge its duties "solely in the interests of the participants and beneficiaries" and for the

18  "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable

19  expenses of administering the plan. UBH also owes plan participants and beneficiaries a duty of

20  care, which requires it to act with reasonable "care, skill, prudence, and diligence" and in

21  accordance with the terms of the plans, so long as such terms are consistent with ERISA. By

22  developing, adopting, and applying its own coverage and level of care guidelines; denying A.L.'s

23  residential mental health coverage in a manner inconsistent with generally accepted standards of

24  medical practice; recommending continued treatment at an illusory level of care; and failing to

25  authorize benefits at the in-network level due to UBH's network inadequacy, UBH violated its

26  fiduciary duties and the terms of Plaintiffs' Plan.

27

28

**COUNT I**
**Claim for Benefits Due (Against UHIC)**

63.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

64.     Plaintiffs bring this Count on behalf of themselves and their son, A.L., pursuant to 29 U.S.C. § 1132(a)(1)(B).

65.     UHIC is the underwriter of Plaintiffs' Plan and is the entity ultimately responsible for paying benefits due under the Plan.

66.     UHIC delegated to UBH its responsibility under Plaintiffs' Plan to make coverage determinations with respect to mental health services.

67.     As alleged above, UBH wrongfully denied the requests for coverage of residential treatment submitted by Plaintiffs, at least in part, based on its failure to account for generally accepted standards of medical practice when recommending ongoing treatment at a lower level of care, PHP, that was known to be non-existent within Plaintiffs' community.  UBH's wrongful denials of coverage, and UHIC's resulting failure to reimburse Plaintiffs for these services, endangered the health and welfare of a severely mentally ill minor and his family, and subjected Plaintiffs to substantial, unreimbursed out-of-pocket expenses.

68.     Furthermore, UBH wrongfully failed to approve, and UHIC failed to provide, coverage for the services that UBH did deem medically necessary under its Guidelines (*i.e.*, PHP services), for no other reason than that those services were obtained as part of treatment at a higher level of care (*i.e.*, residential treatment) that UBH should have covered anyway.

69.     Moreover, contrary to Plaintiffs' Plan and WAC 284-170-200(5), UBH failed to authorize, and UHIC failed to provide, reimbursement of the scant out-of-network RTC coverage that UBH did approve at the in-network benefit level despite UBH's inadequate network of RTC and PHP providers. This, too, resulted in Plaintiffs being required to pay more than their share of approved claims.

70.     UBH's wrongful denials of coverage to Plaintiffs, and UHIC's resulting failure to pay benefits due to Plaintiffs, violated the terms of Plaintiffs' Plans and ERISA. To remedy the

improper denials of coverage alleged in this count, Plaintiffs seek an award of the benefits due to them under their Plan for the services A.L. received.

## COUNT II
### Breach of Fiduciary Duty (Against UBH)

71.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

72.     Plaintiffs bring this Count on behalf of themselves and their son, A.L., pursuant to 29 U.S.C. § 1132(a)(1)(B), to remedy UBH's breaches of fiduciary duty alleged above.

73.     As explained above, UBH exercised its discretionary authority to interpret and apply plan terms when it adopted its 2018 Level of Care Guidelines and when it used those Guidelines to make coverage determinations under Plaintiffs' Plan. As such, UBH was an ERISA fiduciary.

74.     As an ERISA fiduciary, pursuant to 29 U.S.C. § 1104(a), UBH was required to carry out its duties solely in the interests of the participants and beneficiaries of the Plan, to exercise reasonable prudence and due care, and to comply with the terms of the Plan.

75.     UBH violated these duties by adopting the restrictive 2018 Level of Care Guidelines at issue herein. Despite the facts that Plaintiffs' Plan provides for UBH to determine whether services for which coverage is requested are consistent with generally accepted standards of medical practice; that the generally accepted standards of medical practice are widely available and well-known to UBH; and that UBH asserted that its guidelines were consistent with such standards, UBH's 2018 Level of Care Guidelines are in fact—as proven at the *Wit* Litigation trial with respect to the materially identical Guidelines from 2011 through 2017—much more restrictive than generally accepted standards of medical practice. In adopting the 2018 Level of Care Guidelines and in using them to deny coverage to A.L., UBH did not act "solely in the interests of the participants and beneficiaries" of the Lowell Plan for the "exclusive purpose" of "providing benefits." It did not utilize the "care, skill, prudence and diligence" of a "prudent man" acting in a similar capacity. It did not act in accordance with the terms of the Plan.

76.     Instead, UBH elevated its own interests and those of its corporate affiliates above the interests of plan participants and beneficiaries. By adopting its improperly restrictive guidelines,

UBH dramatically narrowed the scope of coverage available under the Plaintiffs' Plan and artificially decreased the number and value of covered claims, thereby benefiting other parties and itself.

77.     Plaintiffs have been harmed by UBH's breaches of fiduciary duty because UBH's development and adoption of the excessively restrictive standards in the 2018 Level of Care Guidelines narrowed the scope of coverage available under their Plan and because their requests for benefits were determined according to a standard that conflicted with the terms of their Plan. UBH denying Plaintiffs' requests for coverage of A.L.'s residential treatment resulted, at least in part, from UBH's use of its overly restrictive Guidelines.

78.     Plaintiffs seek the equitable relief identified below to remedy UBH's breaches of fiduciary duty.

### COUNT III
### Breach of Fiduciary Duty (Against UHIC)

79.     Plaintiffs incorporate by reference the preceding paragraphs as though each were fully stated herein.

80.     Plaintiffs bring this Count on behalf of themselves and their son, A.L., pursuant to 29 U.S.C. § 1132(a)(1)(B).

81.     In addition to being the underwriter of Plaintiffs' Plan, UHIC is also the claims administrator for the Plan and, as such, is ultimately responsible for making benefit determinations under the Plan.

82.     UHIC exercised its discretion as a fiduciary to delegate to UBH its authority to administer the Plan's mental health benefits, and thereafter acted as a co-fiduciary with UBH.

83.     As an ERISA co-fiduciary, pursuant to 29 U.S.C. §§ 1104(a) and 1105, UHIC was required to carry out its duties solely in the interests of the participants and beneficiaries of the Plan, to exercise reasonable prudence and due care, and to comply with the terms of the Plan. UHIC also had a duty to monitor UBH and ensure that UBH was complying with its own fiduciary duties, and to make reasonable efforts to remedy breaches by UBH.

84.     UHIC violated these duties by enabling and failing to correct UBH's misconduct in adopting the pervasively-flawed 2018 Level of Care Guidelines and in wrongfully denying Plaintiffs' claims for coverage.  UHIC did not act "solely in the interests of the participants and beneficiaries" of the Lowell Plan for the "exclusive purpose" of "providing benefits." It did not utilize the "care, skill, prudence and diligence" of a "prudent man" acting in a similar capacity. It did not act in accordance with the terms of the Plan.

85.     Plaintiffs have been harmed by UHIC's acquiescence in and failure to correct UBH's misconduct.  UBH's development and adoption of the excessively restrictive standards in the 2018 Level of Care Guidelines narrowed the scope of coverage available under Plaintiffs' Plan, and Plaintiffs' requests for benefits were determined according to a standard that conflicted with the terms of their Plan.  Furthermore, UBH issued denials of coverage that were wrongful for the reasons described above.

86.     Plaintiffs seek the equitable relief identified below to remedy UHIC's breaches of fiduciary duty.

**COUNT IV**
**Claim for Injunctive Relief (Against Both Defendants)**

87.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

88.     Plaintiffs bring this Count on behalf of themselves and their son, A.L., pursuant to 29 U.S.C. § 1132(a)(3)(A), to enjoin Defendants' acts and practices that violate ERISA, as detailed above. Plaintiffs bring this claim only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

89.     Plaintiffs have been harmed, and are likely to be harmed in the future, by UBH's and UHIC's ERISA violations described above.

90.     In order to remedy these harms and prevent future harm, Plaintiffs are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

**COUNT V**
**Claim for Appropriate Equitable Relief (Against Both Defendants)**

91.    Plaintiffs incorporate by reference all preceding paragraphs as though each were fully stated here.

92.    Plaintiffs bring this Count on behalf of themselves and their son, A.L., pursuant to 29 U.S.C. § 1132(a)(3)(B), to obtain appropriate equitable relief to redress Defendants' breaches of fiduciary duty and ERISA violations, as detailed above. Plaintiffs bring this claim only to the extent that the Court finds that the equitable relief available pursuant to 29 U.S.C. § 1132(a)(1)(B) is inadequate to fully remedy the violations alleged above.

93.    Plaintiffs have been harmed, and are likely to be harmed in the future, by Defendants' breaches of fiduciary duty and ERISA violations described above.

94.    Additionally, by engaging in this misconduct, Defendants unjustly enriched themselves and/or allowed its corporate affiliates to be unjustly enriched insofar as they did not pay benefit claims that they were required to pay under the relevant Plan terms.

95.    In order to remedy these harms, Plaintiffs are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants as follows:

A.    Declaring that the criteria in the 2018 Level of Care Guidelines are not consistent with generally accepted standards of medical practice;

B.    Permanently enjoining UBH from using the 2018 Level of Care Guidelines to administer requests for benefits by Plaintiffs or their son, A.L.;

C.    Awarding Plaintiffs benefits due to them under their Plan;

D.    Awarding appropriate equitable relief, including but not necessarily limited to an appropriate monetary award based on disgorgement, restitution, surcharge or other basis, and additional declaratory and injunctive relief;

E.      Awarding Plaintiffs disbursements and expenses of this action, including reasonable attorneys' and expert fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

F.      Granting such other and further relief as is just and proper in light of the evidence, including but not limited to removal of UBH as a fiduciary as a result of its pattern of misconduct in violation of its fiduciary duties under ERISA.

Dated:   March 20, 2020

/s/ Meiram Bendat
Meiram Bendat (Cal. Bar No. 198884)
PSYCH-APPEAL, INC.
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690 Ext: 101
Fax: (888) 975-1957
mbendat@psych-appeal.com

D. Brian Hufford (*pro hac vice* forthcoming)
Jason S. Cowart (*pro hac vice* forthcoming)
ZUCKERMAN SPAEDER LLP
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel.: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

ZUCKERMAN SPAEDER LLP
Caroline E. Reynolds (*pro hac vice* forthcoming)
1800 M St., NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
creynolds@zuckerman.com

*Counsel for Plaintiffs*